UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KENNETH J. HUTTON,

                              Plaintiff

-vs-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.
_____

DECISION AND ORDER

09-CV-6026 CJS

APPEARANCES

For the Plaintiff:                Paul M. Ryther, Esq.
                                    97 Main Street, P.O. Box 278
                                    East Bloomfield, New York 14443

For the Defendant:             John J. Field, Esq.
                                    Assistant United States Attorney
                                    100 State Street
                                    Rochester, New York 14614

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied plaintiff Kenneth Hutton's ("Plaintiff") application for Social Security

Disability Insurance ("SSDI") benefits. Now before the Court are Defendant's motion

[#9] for judgment on the pleadings, and Plaintiff's motion [#10] for judgment on the

pleadings and remand for calculation of benefits, or in the alternative, for remand for

consideration of new evidence pursuant to 42 U.S.C. § 405(g), sentence six. For the

1

reasons that follow, Plaintiff's application [#10] is denied and Defendant's application [#9] is granted.

## PROCEDURAL HISTORY

This case has a long and complicated procedural history, which is adequately described in the parties' submissions. It is sufficient to note that on October 18, 2001, Plaintiff applied for SSDI benefits, claiming to be disabled since May 1999, due to "chronic depression, PTSD, tense muscles, insomnia, irritability, anxiety, lack of concentration." (146). Plaintiff remained insured for disability benefits through December 31, 2005. After an Administrative Law Judge ("ALJ") issued a decision denying benefits, the Appeals Council remanded the matter for a new hearing. On April 8, 2005, a different ALJ issued a second decision, finding that Plaintiff was not disabled. Subsequently, the case made its way to the United States Court of Appeals for the Second Circuit, where the parties stipulated to another remand. On September 29, 2008, the ALJ issued a third decision, which was partially-favorable to Plaintiff, in that it found him disabled during the closed period February 2, 2003 through April 8, 2004. On January 16, 2009, Plaintiff commenced the subject action. On January 25, 2010, the parties filed the subject cross-motions.

## VOCATIONAL HISTORY

Plaintiff has a Master's Degree in Education, and he worked as a public school social studies teacher for approximately sixteen years. (40, 48).[1] In May 1999, Plaintiff left work on sick leave, and has not worked since. (32-33). Plaintiff stopped working

---

[1] Citations are to the administrative record unless otherwise noted.

because he felt "anxious" and fearful while working in school. (34). Plaintiff's anxiety apparently arose from a combination of factors, including the Columbine School Shooting[2], a feeling that the school administration was not supporting him,[3] and various traumas growing up. Immediately prior to leaving work, Plaintiff experienced insomnia for three days, as well as back pain, and felt that he was "burned out" and might "lose control" at school. (48-49). Plaintiff believes that the pain in his back, which he has continued to experience, is due to stress and muscle tension. (61).

Plaintiff stated that he experienced "manic" episodes, followed by a period depression, approximately once per month. (52-53). During his so-called manic periods, Plaintiff experiences racing thoughts, and he starts many projects which he does not finish. (53). Plaintiff indicated that he spends his free time reading and refinishing furniture. (38). Plaintiff drives a car and performs his own cooking, cleaning, and shopping. (39). In August 2001, Plaintiff indicated that he spent his time attending AA meetings, reading, and "listening to the Yankees." (169). Subsequently, Plaintiff has become active in local politics, and he volunteers for several organizations, including his church, Literacy Volunteers, and Sonnenberg Gardens in Canandaigua, New York, where he does carpenty and maintenance. Plaintiff also writes songs and performs

_____

[2]As discussed further below, Plaintiff had anxiety concerning school shootings, following the Columbine High School shooting, which had occurred in April 1999. (550) ("Shootings in high schools has caused stress restimulation of old tenor during Columbine shootings leading to the depression of his last year teaching.");*see also, id*. at 637 ("His depression at school while working as a teacher was connected to the violence at Columbine High School. He felt fearful in school, believes he had good reason to fear."); (855). In this regard, Plaintiff's anxiety appears to be particularly related to the job of teaching, as opposed to work in general. *See, e.g.*, opinion William Lewek,M.D. ("Mr. Hutton became anxious to the point of incapacit[y] in the high school classroom. I do not believe he could return to being a high school teacher.").

[3]At work Plaintiff began to feel "out of the loop" and "alienated," as a result of certain disagreements with his supervisor. (59-60).

music, and has recorded a music CD.  Additionally, Plaintiff engages in recreational activities including golf and softball. (65-66).

MEDICAL EVIDENCE

Because of the procedural history of this case, there have been hearings before ALJs on three separate occasions: September 10, 2003, November 10, 2004, and June 18, 2004.  At the second hearing, the ALJ indicated that the record was not complete, because it did not contain records concerning all of Plaintiff's visits to his counselors at Clifton Springs Hospital (69-71, 78) ("ALJ: Well, I don't see the information that indicates [that Plaintiff was seeing a therapist] two to three times a month in there, because if we are [sic], we're going to get that information.").  Plaintiff's counsel initially suggested that the record was complete because it contained a summary report from Plaintiff's mental health counselor, but he eventually agreed that the records from all of Plaintiff's appointments should be included. (*Id*.).  At the third hearing, the ALJ again indicated that, although the record contained summary reports from Plaintiff's counselors, he wanted the record to also include the counselor's progress notes. (830). Plaintiff's attorney objected, and indicated that Social Security regulations do not require the inclusion of such notes. (*Id*).  Plaintiff's attorney further indicated that the ALJ could render a decision without such treatment notes, since the record was already strong. (831).   The ALJ nevertheless insisted that he wanted the notes, and he subpoenaed them and included them in the record. (831-832).   Specifically, the ALJ subpoenaed from Clifton Springs Hospital "[a]ll Kenneth Hutton's medical records, including reports, treatment notes, and progress notes from February 17, 2003 to the present." (423-824).  Plaintiff's attorney subsequently wrote to the ALJ, stating that the

subpoenaed records supported Plaintiff's claim of disability. (825-826).

Plaintiff's medical history was summarized in the parties' briefs and need not be repeated here. It is sufficient for purposes of this Decision and Order to note the following facts.

Plaintiff is a recovering alcoholic, who has abstained from alcohol since approximately 1987. (220).

On May 20, 1999, Plaintiff told his primary care physician, Chip Sahler, M.D. ("Sahler"), that he was having trouble sleeping, along with feelings of sadness and an inability to focus. (212).[4] Sahler placed Plaintiff on Paxil, but this caused Plaintiff to feel anxious, so Sahler prescribed Serzone instead. (*Id*.). On June 3, 1999, Sahler stated that Plaintiff was depressed, was not sleeping well, and had slowed speech and thinking. (210). Sahler opined that Plaintiff should not return to work for the remainder of the school year. (*Id*.). On August 13, 1999, Sahler reported that Plaintiff was "vaccilating" about whether to return to teaching, and that he had been considering taking a sabbatical but then had a panic attack. (211). Plaintiff indicated that he was sleeping better, but he still appeared "quite depressed." (211). On September 14, 1999, Sahler noted that Plaintiff was "doing better" on Serzone. (208). On November 9, 1999, Sahler indicated that he was taking Plaintiff off Serzone and placing him on Celexa, because Serzone was making him anxious. (209). In June 2000, Plaintiff stopped treating with Sahler. (334).

---

[4]Plaintiff states that he when he initially went to Sahler's office, a nurse practitioner told him that he was "healthy as a horse," which made Plaintiff angry. (49).

On September 12, 2000, Plaintiff saw Zbigniew Lukawski, M.D. ("Lukawski") for an initial visit. (220). Plaintiff indicated that he "remain[ed] physically active, playing golf, softball, and hiking extensively." (*Id*).[5] Plaintiff told Lukawski that he had a "bout of depression" earlier in the year, for which he took various medications, finally settling on Celexa. (*Id*.). Plaintiff stated, though, that he had stopped taking Celexa in August 2000. (*Id*.). Plaintiff's complaints that day were limited to physical aches and pain, and Lukawski did not provide any treatment for depression. (*Id*.). On December 1, 2000, Plaintiff complained to Lukawski of "depressed mood," and Lukawski observed that Plaintiff was "clinically stable," without suicidal thoughts. (218). Plaintiff complained of side-effects from taking Serzone, and Lukawski prescribed Zoloft. (*Id*.). On December 21, 2000, Lukawski reported that Plaintiff's depression was "well controlled" with Zoloft. (217). On February 5, 2001, Plaintiff told Lukawski that his depression was "not under good control," although he felt better Zoloft than without it. (216). On February 27, 2001, Plaintiff told Lukawski that his depression had improved since his Zoloft dosage was increased. (215, 328). On May 22, 2001, Lukawski reported that Plaintiff's depression was "relatively well controlled." (214).

On March 4, 2001, Plaintiff began treating with William Lewek, M.D. ("Lewek"), a psychiatrist. (244). On March 29, 2001, Lewek stated that Plaintiff had "tried a variety of medications including Paxil, Serzone, and Celexa with poor results." (*Id*.). Lewek indicated that Plaintiff was currently taking Zoloft, 200 mg. (*Id*.). Lewek reported that Plaintiff claimed to suffer from "mood swings, severe anxiety, fatigue, excessive sleep,

---

[5]On November 10, 2004, Plaintiff told the ALJ that he had not hiked in five years. (66).

labile mood and worry." (*Id*.). Lewek's diagnoses were "major depression, dysthymia, anixiety disorder, and alcohol dependence in remission x13 years." (*Id*.). Plaintiff indicates that he saw Lewek "every couple months." (35). On October 8, 2001, Lewek completed a disability evaluation form. (245-256). Lewek stated that Plaintiff's symptoms were "fluctuating mood reactive to stressors, distractibility, irritability." (246). Lewek indicated that he saw Plaintiff "mainly for medication management," and that Plaintiff had a "good" and "robust response" to Wellbutrin. (246, 249). Lewek observed that as of July 2001, Plaintiff's fatigue, secondary to depression, "had abated a great deal." (247). Lewek further stated that as of July 2001, Plaintiff was "not depressed," and had a normal affect. (250). Lewek also stated that Plaintiff was oriented and had no memory problems, but had "difficulty focusing." (*Id*.). Lewek noted that Plaintiff was "interested in music, carpentry and writing songs." (252). Lewek opined that although Plaintiff was "less depressed he is a fragile individual who could easily decompensate with stress." (252). Lewek stated, though, that Plaintiff had "no limitation" on his ability to interact socially with supervisors and co-workers, and that he "currently" would have no limitation adapting to changes in the work setting. (255). Lewek specifically stated that he did not think that Plaintiff could return to teaching high school. (255).

On October 1, 2001, Lukawski reported that Plaintiff's depression was "overall under good control, but he occasionally has down feelings." (325).

On October 4, 2001, John Thomassen, Ph.D. ("Thomassen"), performed a psychiatric evaluation. (231-235). Thomassen was a non-treating independent examiner. Plaintiff told Thomassen that he was unable to work due to "depression and Post Traumatic Stress Disorder." (231). Plaintiff denied having any psychiatric

hospitalizations. (*Id*.). Plaintiff stated that he was anxious about continuing to work in a school, and was "traumatized by fear that children would bring guns to school." (232). Plaintiff reported having low energy and no goals for the future, but his sleep and appetite were normal. (*Id*.). Plaintiff's affect was muted, his mood was dysphoric, and his "thought processes were coherent and goal directed with no evidence of thought disorder." (233). Plaintiff's speech was slow, but otherwise appropriate. (*Id*.). Plaintiff's attention, concentration, and memory were intact, and his intelligence was in the "above average range." (*Id*.). Plaintiff's insight and judgment were good. (233-234). Plaintiff reported having "some problems" getting along with his family, and noted a loss of interest in activities such as walking and playing softball. (234). Plaintiff stated that he spent an average day going to AA meetings and doing chores. (*Id*.). Thomassen's diagnosis was "anxiety disorder, not otherwise specified," and "dysthymic disorder." (*Id*.). Thomassen stated that Plaintiff "present[ed] with mild symptoms of depression and anxiety for which he is likely to benefit from ongoing counseling." (*Id*.). Thomassen opined that Plaintiff would be able to follow simple directions and perform rote tasks, and that Plaintiff could perform "complex tasks consistent with his skill level." (Id.). Thomassen indicated, though, that Plaintiff would "have some problems relating with co-workers and coping with stress." (*Id*.). Overall, Thomassen found that Plaintiff's "allegations of psychiatric disability were not fully consistent with examination findings." (*Id*.).

On October 4, 2001, Plaintiff was given a physical examination by George Sirotenko, D.O. ("Sirotenko"), a non-treating, independent examining physician.

Notably, Plaintif told Sirotenko that he had attempted suicide "three years ago," an allegation that does not appear elsewhere in the record. (238). Sirotenko observed that Plaintiff had a "flat affect and [a] somewhat depressed demeanor." (239).

On March 4, 2002, Plaintiff told Lukawski that his depression was "under control" with 50 mg of Zoloft each day, and he asked Lukawski if he could stop taking Zoloft altogether. (323). Lukawski advised Plaintiff not to reduce his Zoloft dosage on his own. (*Id*.). On October 16, 2002, Plaintiff saw Lukawski for a yearly physical exam. Plaintiff told Lukawski that his depression was "still not controlled very well" while taking Zoloft and Zyprexa. (319-320).

On September 8, 2003, Lukawski completed a "Mental Impairment Evaluation" form prepared by Plaintiff's attorney. (288-291). Lukawski stated that he began treating Plaintiff in September 2000. (288). Lukawski stated that Plaintiff would have a "fair" ability to follow work rules, relate to co-workers, and function independently, but would be "seriously limited" with regard to using judgment, and would have "poor or no" ability to deal with the public, interact with supervisors, deal with stress, and maintain attention/concentration. (290). Lukawski further stated that Plaintiff would be "seriously limited" in his ability to understand, remember, and carry out complex job instructions. (291).

On September 19, 2003, Kathryn DeBruin, CSWR ("DeBruin") completed a "Mental Impairment Evaluation" form prepared by Plaintiff's attorney. (296-299). DeBruin stated that she had counseled Plaintiff eighteen times between January 2003 and September 2003. (296). DeBruin stated that Plaintiff "recently had a 3 day hypomanic episode," consisting of "problems sleeping, problems completing tasks,

9

racing thoughts, [with an] increase in energy," after which he became depressed. (296). DeBruin reported that Plaintiff had a flat affect and depressed mood. (297). Nevertheless, DeBruin's evaluation was fairly positive concerning Plaintiff's ability to work. In that regard, DeBruin stated that Plaintiff would have a good ability to follow work rules, maintain concentration and attention, maintain his personal appearance, demonstrate reliability, and understand and carry out simple job instructions; a fair ability to relate to co-workers, deal with the public, use judgment, understand and remember complex and detailed job instructions, interact with supervisors, function independently, behave in an emotionally stable manner, and relate productively in social situations. (298-299). DeBruin stated that Plaintiff would be "seriously limited" with regard to dealing with work stressors. (298).

On August 17, 2004, Lukawski stated that Plaintiff's ability to understand, remember, and carry out instructions were affected by his depression, but that his condition did not affect his ability to related appropriately to supervisors, co-workers, and "work pressures in a work setting." (304).

On June 9, 2005, Daniel Morris, LCSW ("Morris") completed a "Mental Impairment Evaluation" form prepared by Plaintiff's attorney. (413-416). Morris indicated that he began counseling Plaintiff in February 2003. (413). Morris stated, "Patient has generally stabilized. He has periodic downturns along with what are now considered periods of mania. A bipolar condition has been diagnosed." (413).[6] More specifically, Morris stated that Plaintiff experienced a downturn in his mood during the

---

[6]Morris' notes from February 3, 2005, state only: "We evaluated possibility of him having a bipolar disorder – will continue the discussion." (702).

"winter months," and that he had a "brief manic phase" in the fall of 2004. (414). Morris indicated that Plaintiff became "distractible" during his manic phases. (*Id*.). Morris reported that Plaintiff had "normal" attitude, appearance, behavior, speech, thought, perception, orientation, memory, information, and judgment. (*Id*.). However, Morris noted that Plaintiff claimed to have suicidal ideations when depressed. (*Id*.). Morris appears to have attributed Plaintiff's depression to a "series of traumatic events" between the Fall of 1998 and Spring of 2003, including the deaths of his mother and a friend, the loss of his job, and his third divorce. (416). Morris evaluated Plaintiff's ability to perform work related adjustments, and noted that his observations were based on Plaintiff's related experiences as a teacher. (415) ("All this is based upon his past work experience as a teacher."). Morris concluded that Plaintiff would be "seriously limited" with regard to following work rules, relating with co-workers, using judgment, interacting with supervisors, and functioning independently. (415). Morris stated that Plaintiff would have "poor or no" ability to deal with the public, deal with work stress, and maintain attention/concentraton. (415). Morris further stated that Plaintiff would be "seriously limited" with regard to understanding, remembering, and carrying out work instructions. (416).

Morris' notes dated July 21, 2005 include this statement: "In order to successfully combat his ongoing depression, in light of this [sic] [treatment] focus has been on . . . to get back to engaging in creative purposeful work. We believe that not having an adequate income is a major factor in maintaining is depression." (439). On September 8, 2005, Plaintiff's mood was normal, his affect and thought content were appropriate. (478). Plaintiff told Morris that his mood was improved, and they discussed the

possibility of Plaintiff returning to work as a teacher. (478). On October 6, 2005, Morris reported that Plaintiff was "performing volunteer work," and "has enjoyed this." (443). On December 15, 2005, Morris noted that Plaintiff's mood had "significantly improved over [the] past 6 months," and that Plaintiff was performing volunteer work at Sonnenberg Gardens. (496). On February 16, 2006, Morris stated that Plaintiff's "meds have worked well [and] he loves volunteering at Sonnenberg." (512). On March 14, 2006, Morris reported that Plaintiff's volunteer job at Sonnenberg was "working out very well," and that Plaintiff had found school teaching "very frustrating," and that he would not want to return to teaching. (518). On March 21, 2006, Morris reported that Plaintiff's mood was "good," and that in addition to volunteering at Sonnenberg, Plaintiff was also working with Literacy Volunteers, and feeling "renewed excitement in teaching." (520). On April 4, 2006, Plaintiff told Morris that he had not had a "deep depression" in "at least one year," and that his volunteer work gave him "greater purpose in life." (522). On May 17, 2006, Plaintiff told Morris that he found volunteer work to be "very helpful," but that he could not graduate to part-time work because he would "lose his disability." (528). On May 24, 2006, Morris observed that Plaintiff's mood was "very good," and that Plaintiff was enjoying volunteering and teaching Sunday School, and was working on making a music CD and writing songs. (530) (Noting that Plaintiff "has enjoyed volunteer work. We have not actively discussed return to work possibilities."). On June 14, 2006, Plaintiff told Morris that he was thinking about whether he could start a new career. (532). On August 7, 2006, Morris noted that Plaintiff's "current meds and dosage are working well," and that Plaintiff was "debating whether he can successfully return to paid work. Is unsure of what consequences would be if he were working and

suffered a downturn." (457). Morris further observed that Plaintiff was "not depressed," and was going to be a leader of his church's youth group. (540). On September 25, 2006, Morris noted that Plaintiff's mood was "very good," and that he was "involved in varied political action, volunteering [and] enjoying this." (548). On October 26, 2006, Morris reported that Plaintiff's mood was "generally stable," although he "had a reaction" to a news report concerning a school shooting somewhere. (462). Plaintiff continued to think about returning to paid work, but his reaction to news of the school shooting caused him to worry that he might not be able to handle job stress. (462). In November 2006, Morris noted that Plaintiff was "doing very well," and was continuing to do volunteer work. (563). On January 8, 2007, Morris reported that Plaintiff's "mood is very good – volunteer work has been very rewarding." (567). On January 22, 2007, Morris and Plaintiff discussed the possibility of Plaintiff returning to work, and Plaintiff expressed concern over how he might react if he became too stressed. (569).

On June 5, 2007, Dr. Stanko Rodic, M.D. ("Rodic"), a psychiatrist, noted that Plaintiff's mood was depressed and his affect was constricted. (782). Plaintiff's thought content, intelligence, insight, judgment, and attention span were all within normal limits. (781). On September 12, 2007, Rodic reported that Plaintiff's mood was within normal limits and his affect was appropriate. (790). Plaintiff told Rodic that he was "doing alright" and that he had a "pretty good summer." (789). Rodic advised Plaintiff against stopping his medication. (*Id*.) ("Not recommended to get off [medication], particularly now that we found out what's working."). On January 2, 2008, Rodic noted that Plantiff "continues to do well." (799). Rodic observed that Plaintiff's mood was depressed, but otherwise his examination was within normal limits. (800). On April 3, 2008, Rodic

noted that Plaintiff was having some racing thoughts and decreased concentration. (810). At a follow-up visit on April 24, 2008, Rodic observed that Plaintiff was calm, with no racing thoughts. (812). Rodic stated that Plaintiff had been off Wellbutrin for five days. (*Id*.). Rodic stated that he would re-start Plaintiff on "Wellbutrin 150 mg in case depression reoccurs." (*Id*.). Plaintiff's mood was within normal limits and his affect was appropriate. (813).

On July 26, 2007, Allison Nunez, CSW ("Nunez") reported that Plaintiff was questioning whether he needed to remain on medication. (749). Nunez further wrote:

> [Patient] continues to engage in constructive volunteer work. Enjoys it and has been well appreciated by others for it. At one point, Patient was becoming overwhelmed with the number of volunteer commitments he had. He realized this was causing him to experience an increase in his depression and made a plan to decrease hi[s] workload. The has proven to be effective in decreasing his depressive symptoms.

(749). On September 27, 2007, Nunez reported that Plaintiff was in a "stable mood and enjoying volunteer opportunities." (791). Nunez indicated that Plaintiff's mood was within normal limits and his affect was appropriate. (792).

On October 24, 2007, Todd Kennedy, CSW ("Kennedy") met with Plaintiff, and reported that Plaintiff's mood was depressed, but his affect was appropriate, his thought content was goal-directed, his memory was intact, and his intelligence, insight, judgment, and attention span were all within normal limits. (795). On November 15, 2007, Kennedy noted that Plaintiff "continue[d] to report some symptoms of depression and anxiety." (797). On June 13, 2008, Kennedy completed a "Mental Impairment Evaluation" form prepared by Plaintiff's attorney. (418-421). Kennedy indicated that he began counseling Plaintiff some four months earlier, in February 2008. (420). Kennedy

opined that Plaintiff had "severe depression symptoms that interfere [with] his ability to function effectively in the workplace. [Patient] has difficulty with both long- and short-term memory, attention, concentration, and effectively working with others." (418). Kennedy stated that Plaintiff's affect was "flat, depressed," his attitude was depressed, and that his memory and intellectual functioning were "decreased." (421). On February 20, 2008, Plaintiff told Kennedy that he was stressed because his church pastor had died. (806). On May 9, 2008, Plantiff told Kennedy that he felt "pretty good," but Kennedy nevertheless indicated on the form that Plaintiff's mood was depressed. (814-815).

## STANDARDS OF LAW

_____42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

The SSA has promulgated administrative regulations for determining when a

15

claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE")](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[7] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[8]

---

[7]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[8]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)). Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

---

directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states

in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a). The regulation further states, in

pertinent part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. At the second step of the analysis, the ALJ found that plaintiff had the following severe impairments: "degenerative joint disease, an affective disorder and an anxiety disorder." (878). At the third step of the analysis, the ALJ found that Plaintiff had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, but only for the period February 3, 2003 through April 29, 2004. The ALJ observed that Plaintiff's condition "improved with treatment b y the end of April 2004," based upon medical evidence, including Plaintiff's Global Assessment Functioning ("GAF") scores, which indicated only moderate or mild symptoms. (879). The ALJ also noted: "Further, the claimant's reports to treating sources and his testimony at the hearing reveal that he has been engaging in extensive volunteer activities that have helped improve his condition." (880). In that regard, the ALJ discussed the weight that he gave to various medical opinions, and indicated that he gave "greater weight" to DeBruin's opinions, because her opinion was "more consistent with the record as a whole than that of the treating physicians." (879). The ALJ indicated that he did not give significant weight to

Lukawski's opinion, "because he is not a mental health professional but a primary care physician, because he did not record any specific signs or symptoms he may have observed, and because he clearly based his opinion solely on the claimant's subjective complaints." (*Id*.). The ALJ further stated that he did not give significant weight to Lewek's opinion, because Lewek "did not have a longitudinal treating history with the claimant." (*Id*.). Moreover, the ALJ stated that he did not give significant weight to Thomassen's opinion, because Thomassen "saw the claimant once and does not have a treating relationship." (*Id*.). The ALJ also indicated that he did not give weight to Kennedy's opinions regarding Plaintiff's ability to work, since they were inconsistent with Kennedy's own treatment notes. (881). Apart from this closed period of disability, the ALJ found that Plaintiff's mental impairments caused only mild restrictions in daily living, social functioning, moderate difficulties in maintaining concentration, and one episode of decompensation. (879).

At the fourth step of the sequential analysis, the ALJ found that Plaintiff could not perform his past relevant work. The ALJ found further found that Plaintiff had the following RFC: "[D]uring the periods May 19, 1999 to February 1, 2003 and since April 30, 2004, the claimant has had the [RFC} to perform medium work as defined in 20 CFR 404.1567(c) except that he could only occasionally interact with the public; only frequently interact with co-workers and supervisors; and only occasionally understand, remember and carry out complex and detailed tasks." (880).

At the fifth step of the sequential analysis, the ALJ found that Plaintiff could perform "a significant number of jobs in the national economy." (882). In that regard, the ALJ relied on the testimony of Vocational Expert Peter Manzi ("the VE"), who stated

that Plaintiff could perform such jobs as information clerk, hand packager, and laundry worker. (883).  More specifically, the ALJ asked the VE to consider a hypothetical claimant who could perform the full range of medium work,[9] with the following non-exertional limitations: "can occasionally interact with the public, frequently with co-workers and supervisors; and can occasionally remember, understand, and carry out complex and detailed tasks." (863).[10]  In response, the VE stated that such a person could work as an information clerk, hand packager, and laundry worker.  (865-867).

Consequently, the ALJ found that Plaintiff was not disabled at any time prior to his date last insured, December 31, 2005, except for the closed period indicated above.

ANALYSIS

Plaintiff maintains that the ALJ erred in applying the treating physician rule, and more specifically, by failing to give controlling weight to Lewek's opinion, and by failing to give significant weight to Lukawski's opinion.  With regard to Lukawski's opinion, Plaintiff admits that such opinion is not entitled to controlling weight, because it is not based on recorded clinical observations.  Plaintiff further contends that the ALJ erred in subpoenaing progress notes from Clifton Springs Hospital, and that the ALJ erred in interpreting those notes, by putting too much emphasis on GAF scores.  Alternatively, Plaintiff contends that the Court should remand the case for consideration of new

---

[9]Plaintiff's attorney agreed that Plaintiff had the physical ability to perform a full range of medium work. (*See*, 867).

[10]Plaintiff's attorney asked the VE to consider an alternative scenario, involving a claimant who could perform medium work with non-exertional restrictions including the inability, most of the time, to follow work rules, interact appropriately with co-workers and supervisors, deal with work stress, function independently, or maintain concentration. (868-869).  The VE responded that such a person could not work. (869).

evidence, pursuant to 42 U.S.C. § 405(g), sentence six.  In that regard, Plaintiff obtained an additional report from Rodic, in November 2008, which he wants included in the record.

At the outset, the Court denies Plaintiff's motion to remand the case for consideration of additional evidence.  The proposed new evidence, consisting of a report from Rodic dated November 18, 2008, indicates that Rodic began treating Plaintiff in February 2006, approximately one month after Plaintiff's insured status expired. (*See*, Docket No. [#10]).  Rodic stated that Plaintiff was treated for depression and bipolar disorder, which conditions "improved overall due to medications, verbal therapy and [Plaintiff's] own community related activities."  Rodic noted that Plaintiff had one "brief manic episode."  Rodic stated that as of November 2008, Plaintiff seemed to be in a good mood, with a bright affect and positive attitude, with no evidence of a thought disorder, and with only "some fuzziness for past memories."  Notably, Rodic's report contains a hearsay statement from Lewek, purportedly made by Lewek to Rodic, that Plaintiff was "disabled" in 2000-2002.

With a remand under sentence six of Section 405(g), "the court does not enter judgment as to the propriety of the Commissioner's decision but instead remands for the receipt of new evidence." *Giraldo v. Building Service 32B-J Pension Fund*, 502 F.3d 200, 202 (2d Cir. 2007).  Sentence six of § 405(g) states, in pertinent part, that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]"  Accordingly, such new evidence must be new, it must be

material, and there must be good cause for the failure to include it in the record:

> [A]n appellant must show that the proffered evidence is (1) 'new' and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative[.] The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently. Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

*Lisa v. Secretary of Dept. of Health and Human Services of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991) (citations omitted).

In this case, the proposed new evidence is not really new, since it is essentially cumulative of Rodic's notes that are already in the record. Rodic's November 2008 report is also not overly relevant, since it was written years after Plaintiff's insured status ended. And finally, Plaintiff has not shown good cause for failing to include the report earlier. Instead, the record shows that Plaintiff's attorney knew that Rodic was traveling outside of the United States at the time of the hearing, and that the attorney made a tactical decision not request that the record be kept open to obtain a report from Rodic. As discussed earlier, Plaintiff's attorney thought that the record before the ALJ at the time of the hearing was already "very strong" in support of Plaintiff's claim. (831). It was apparently not until Plaintiff received a partially-unfavorable decision that Plaintiff decided to seek an additional report from Rodic. Consequently, the motion to remand for consideration of additional evidence is denied.

The Court also finds that Plaintiff's remaining arguments lack merit. The ALJ's determinations regarding Plaintiff's residual functional capacity, including the evaluation of medical opinions, were not based on erroneous legal standards, and are supported

by substantial evidence.  The fact that the ALJ did not specifically discuss all of the factors set forth in 20 CFR § 404.1527(d)(2) does not require reversal. *See, Terreri v. Astrue* , No. 07-CV-277-JTC, 2009 WL 749860 at * 5 -6  (W.D.N.Y. Mar. 18, 2009):

> [T]he court finds adequate support in the case record for the ALJ's determination to give greater weight to the reports of the consulting and reviewing physicians than he gave to the opinion of plaintiff's treating orthopedic surgeon. Although the ALJ did not indicate in his written decision that he fully considered the nature and extent of plaintiff's treatment relationship with Dr. Capicotto, or the other factors enumerated in 20 C.F.R. § 404.1527(d)(2), he provided a detailed summary and analysis of the reports and records of all treating, examining, and reviewing medical sources, including Dr. Capicotto's assessment that plaintiff's medical condition rendered him unable to work for the purposes of his workers' compensation claim. This analysis makes it clear that the ALJ based his findings upon a thorough consideration of the record, including the medical evidence and plaintiff's testimony, and not upon an arbitrary substitution of his own judgment for competent medical opinion.

(citations omitted), *aff'd*, 2010 WL 726726 at *1 (2d Cir. Mar. 3, 2010) (Rejecting the Plaintiff-Appellant's argument that "the District Court erred in affirming the decision of the Administrative Law Judge ("ALJ") because the ALJ failed to consider or explain his reasons for discrediting the opinion of Terreri's treating physician, in violation of 20 C.F.R. § 404.1527(d)(2).").

With regard to Lukawski, the Court also notes that his report dated September 18, 2003, which is most helpful to Plaintiff, is inconsistent with his other opinions and with much of the rest of the record.  For example, in the September 18, 2003 report, Lukawski stated that Plaintiff would have "poor or no" ability to deal with the public, interact with supervisors, or deal with work stress, but in his August 17, 2004 report, he stated that Plaintiff's impairment did not affect his ability to deal with the public, interact with supervisors or co-workers, or respond to work pressures. (290, 304).

Overall, the record indicates that Plaintiff could perform some type of low-stress job such as those identified by the ALJ, even though he probably could not return to work as a high school teacher.

Moreover, the ALJ's decision to subpoena Plaintiff's progress notes was not erroneous.

CONCLUSION

For the reasons discussed above, Plaintiff's application [#10] is denied, Defendant's application [#9] is granted, and this action is dismissed.

So Ordered.

Dated: Rochester, New York
       April 25, 2010

                                    ENTER:


                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge